**UNITED STATES of America, Plaintiff,**

**and**

**State of Iowa ex rel., Iowa Department of Natural Resources, Plaintiff–Intervenor,**

**v.**

**ACETO AGRICULTURAL CHEMICALS CORP., Ciba–Geigy Corporation, The Dow Chemical Corporation, Farnam Companies, Inc., Mobay Corporation, Mobil Oil Corporation, Velsicol Chemical Corporation, and Platte Chemical Corporation, Defendants.**

Civ. No. 87–21–W.

United States District Court,
S.D. Iowa, W.D.

Feb. 26, 1988.

Sarah P. Robinson, U.S. Dept. of Justice, Land and Natural Resources Div., Appellate Section, Washington, D.C., for plaintiffs.

Eliza Ovrom, Asst. Atty. Gen., Des Moines, Iowa, for intervenor.

Thomas C. McGowan, Omaha, Neb. and Christopher J. Tinley, Council Bluffs, Iowa, for defendant Platte Chemical Corp.

Theodore Garrett, Keith A. Teel, Washington, D.C. and Edward Remsburg, Des Moines, Iowa, for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter comes to the Court on motions to dismiss for failure to state a claim filed on behalf of each defendant. These motions challenge the authority of the United States and the State of Iowa to recover the costs of cleaning up a contaminated site of a defunct pesticide formulator through civil actions against the manufacturers who sent active pesticide ingredients to the site for formulation and packaging. The United States and the State have filed actions under § 107(a)(3) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), codified at 42 U.S.C. § 9607(a)(3), and § 7003 of the Resource Conservation and Recovery Act ("RCRA"), codified at 42 U.S.C. § 6973.[1] For the following reasons, the Court denies the motions with regard to the CERCLA counts, but grants them with regard to the RCRA counts.

From 1974 until its Chapter 7 liquidation in 1981, Aidex Corporation formulated, packaged and distributed pesticides and herbicides at a site in the Missouri River floodplain near Glenwood, Iowa. At the time of the liquidation, the Aidex site included four metal buildings, an 8,000–gallon underground storage tank, two waste burial trenches, the foundation of a liquid formulation building destroyed by fire in 1976, and hundreds of storage drums and tanks containing hazardous wastes and other hazardous substances. According to the United States' complaint, the 1976 fire and the water used to extinguish it caused various chemicals stored in the building to spill onto the ground and spread over the surface of the site, contaminating the soil. In addition, the storage tank was deteriorating, and chemical wastes were leaking from many of the storage drums.

These conditions attracted the attention of the Environmental Protection Agency, which was empowered under CERCLA with authority to clean up sites in response to imminent and substantial dangers to the public health or welfare created by the release of hazardous substances. *See* CERCLA, § 104(a), 42 U.S.C. § 9604(a). The State of Iowa's Department of Natural Resources possesses similar authority under Iowa law. *See* Iowa Code § 455B.418(1)(c) (1987). Solid and liquid chemical wastes and contaminated debris

---

**1.** The State's complaint also contains certain state law claims. The parties have stipulated that the defendants need not respond to these claims until the Court has ruled upon defendants' motions to dismiss the federal claims. All of the companies have been sued by both plaintiffs under RCRA, while the allegations under CERCLA are directed at only five of the companies, and not at the CIBA–GEIGY Corporation or Mobil Oil Corporation. As a consequence, it is necessary for the Court to address the arguments concerning both RCRA and CERCLA.

were collected and transported to EPA-approved sites for incineration or disposal. Contaminated surface soils were removed from the drum storage area and placed in a storage area constructed on-site. (U.S. Complaint, ¶ 26.) Additional remedial actions were taken in 1986, and future actions may be necessary. "As of November 30, 1986, EPA has expended approximately $10,013,700.00 on these response actions." (U.S. Complaint, ¶ 27.) As of March 1, 1987, the State of Iowa has incurred expenses of $95,451.00, and is committed by contract with the EPA to pay an additional $780,000.00. (Iowa Complaint at ¶ 7.)

### THE CERCLA CLAIMS

To fund the EPA's response efforts, Congress created the Hazardous Substance Response Trust Fund, better known as the "Superfund", which is financed through a combination of appropriations, taxes on the manufacture of petroleum products and certain inorganic chemicals, and judgments received through legal actions under § 107 of CERCLA. "CERCLA does not identify expressly the elements of a prima facie case of liability for cleanup costs. Instead, the statute merely lists classes of potentially liable parties [§ 107(a)] and provides three causation-based defenses [§ 107(b)]." *United States v. Bliss,* 667 F.Supp. 1298, 1304 (E.D.Mo.1987). Because the defenses are relatively weak,[2] the critical issue in most cases is whether each defendant is a member of one of the following classes of potentially liable parties:

(1) The owner and operator of a vessel or a facility,

(2) Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) Any person who *by contract, agreement, or otherwise arranged for disposal* or treatment, or arranged with a

transporter for transport for disposal or treatment *of hazardous substances owned or possessed by such person,* by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

CERCLA, § 107(a), 42 U.S.C. § 9607(a) (emphasis added).

In an ordinary situation, liability under subdivision (a)(3) will extend to generators of hazardous wastes.[3] Generators are typically liable not because they generate wastes, but because they typically arrange for the disposal of wastes they have generated. *Bliss,* 667 F.Supp. at 1306; *Violet v. Picillo,* 648 F.Supp. 1283, 1288 (D.R.I. 1986); *United States v. Ward,* 618 F.Supp. 884, 893–94 (E.D.N.C.1985); *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 190 (W.D.Mo.1985); *United States v. Mottolo,* 629 F.Supp. 56, 60 (D.N. H.1984).

Generators of wastes seldom operate at the first point in the stream of production; usually other companies operate "upstream" from waste generators, and sell raw materials and unfinished products which are purchased by generators. Because the involvement of upstream producers in the production of wastes ordinarily ends at the point of the sale of raw materials, it could hardly be said that such producers thereby arrange for the disposal of hazardous wastes. Thus, they are not ordinarily liable under § 107(a)(3). *Cf. United*

**2.** To avoid liability under § 107(b)'s defenses, a party must prove that the damages were caused *solely* by an act of God, an act of war, or an act or omission of a restricted category of third parties. Because causation is normally one of the most difficult elements to prove in a toxic

waste site case, the burden of establishing any of those defenses can be overwhelming.

**3.** This Court's use of the term "waste" instead of "substance" should not be given any significance. *See* note 4, *infra.*

*States v. Westinghouse,* 14 Env.Law Rptr. 20,483, 20,484 (S.D.Ind.1983).

■ Because the pesticides industry is structured in a unique manner, the liability of pesticide manufacturers must be considered separately. According to the United States, "it is a common practice in the pesticide industry for a manufacturer of a technical grade pesticide to arrange for another company to formulate and package a commercial grade pesticide from a technical grade pesticide and to package the resulting product for the manufacturer." (¶ 46.) The formulator is more of an independent contractor than a purchaser, because the manufacturer normally maintains ownership of the technical grade pesticide, the work in progress, and the commercial grade pesticide even after possession passes to the formulator. (¶ 50.) If the plaintiffs' allegations are true, as the Court must assume at this stage, "the generation of wastes containing a pesticide through spills, cleaning of equipment, mixing and grading operations, production of batches that do not meet specifications and other means, is inherent in the formulation process." (¶ 47.)

The plaintiffs contend that all defendants except Mobil and CIBA–GEIGY arranged for the disposal of hazardous substances within the meaning of § 107(a)(3) by arranging for Aidex to formulate and package their pesticides through processes which necessarily result in the generation of wastes. These defendants respond that the language of § 107(a)(3) cannot be stretched to cover manufacturers which did not generate wastes or take any affirmative action to dispose of wastes, but merely sent valuable products to a generator with the intent that the products would be processed and not discarded.

The defendants must surmount two obstacles in order to persuade this Court to dismiss the CERCLA claims at so early a stage in the litigation. The first obstacle is procedural. "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). "This rule, which has been stated literally hundreds of times, precludes final dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605, 607 (8th Cir.1972).

The second obstacle is the canon of construction which federal courts have employed when interpreting CERCLA. "CERCLA has acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history." *United States v. Mottolo,* 605 F.Supp. at 902. "Nevertheless, Congress intended broad judicial interpretations of CERCLA in order to give full effect to two important legislative purposes: to give the federal government the tools necessary for a prompt and effective response to hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the costs of their actions." *Violet v. Picillo,* 648 F.Supp. at 1288; *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112 (D.Minn.1982). Thus, the First and Second Circuits have ruled that "we will not interpret § [107(a) ] in any way that apparently frustrates the statute's goals, in the absence of a specific congressional intent otherwise." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986) (*quoting New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2d Cir.1985)).

A dismissal of these actions may not frustrate the cleanup of the Aidex site, which is largely over. However, the cost for cleaning up the site would remain with the Superfund and the State, thereby impairing the ability of the EPA and the State to clean up sites elsewhere. Thus, *if* the Court finally determines that these defendants were "responsible for creating hazardous waste products" (a conclusion which is far from certain in this context), the defendants must come up with evidence of a specific congressional intent that

§ 107(a)(3) should not apply here in order to prevail.

The question of whether the six CERCLA defendants can be responsible for the Aidex mess turns on the meaning of the requirement that the defendants have "by contract, agreement or otherwise arranged for disposal" of the hazardous substances released in the environment at the Aidex site. The complaint unquestionably describes a disposal of hazardous substances[4] by Aidex, so the critical question is whether the relationship of the defendants to that disposal as set out in the complaints can properly be viewed as an arrangement by those defendants for the disposal of those wastes.

Traditionally, the words of the statute provide the best indication of its scope. *People v. Knowles*, 35 Cal.2d 175, 182, 217 P.2d 1, 5 (1950). At the same time, however, "one certain way of missing [the meaning of a statute] is by reading it literally, for words are such tempermental beings that the surest way to lose their essence is to take them at their face." L. Hand, Remarks on the Commemoration of his Fiftieth Year as a Federal Judge, reprinted in 264 F.2d 1, 27 [preliminary pages] (1959). In the literal sense, an arrangement seldom occurs accidentally. However, the defendants' definition—which would find an arrangement for disposal only if disposal of wastes was the desired result—focuses the Court's attention on the defendants' motives. This approach would be out of place in a regulatory scheme which is primarily concerned with what actually occurred rather than what was intended to occur. Furthermore, their emphasis on purposefulness may be unnecessary. For example, the Court questions whether a husband could avoid liability for arranging to have his wife murdered by showing that his ultimate objective was not to have her killed, but to collect from her insurance policy. In some circumstances, the Court believes an arrangement based on acquiescence to certain inevitable effects can be considered an arrangement for such effects.

The legislative history of CERCLA is "sparse and generally uninformative" with regard to specific questions concerning the interpretation of the Act's terms. *Chemical Waste Management v. Armstrong World Industries*, 669 F.Supp. 1285, 1291 n. 6 (E.D.Pa.1987). It is especially unhelpful in resolving questions of this sort, which the 96th Congress most likely did not anticipate in its haste to act before its term ended.

One court has interpreted § 107(a)(3) in the context of a suit against pesticide manufacturers for the recovery of costs of cleaning up a formulation site. In *United States v. Velsicol Chemical Corp., et al.*, 701 F.Supp. 140 (W.D.Tenn.1987), the United States brought a nearly identical action under this section against three pesticide companies which sent pesticides to other companies for formulation and packaging. As in this case, the EPA was seeking to recover the costs of cleaning up the formulation sites. As in this case, the defendants filed a motion to dismiss, contending that they merely supplied active pesticide ingredients to the formulator, who subsequently disposed of chemicals at the site. The Court found the complaint sufficient to state a claim under § 107(a)(3), but for reasons which are difficult to discern from the order.

The most attractive support for the defendants' interpretation is a district court's

---

**4.** This is true even if a "disposal" within the meaning of CERCLA must be a disposal of *wastes,* and not simply a disposal of valuable but hazardous substances. The plaintiffs have devoted much attention to the use of the term "hazardous substances" in § 107(a)(3) rather than hazardous wastes, and contend that disposal of a hazardous substance is a legally sufficient "disposal". Defendants correctly note that CERCLA directs courts to RCRA for the definition of disposal, *see* CERCLA, § 101(20), 42 U.S.

C. § 9601(20), and that a disposal under RCRA must involve a solid or hazardous waste. *See* 1003(4) of RCRA, 42 U.S.C. § 6902(4). However, the complaint unambiguously alleges that the substances discarded during formulations for the six CERCLA defendants at the Aidex site were wastes. Thus, as long as the relevant disposal is the disposal of wastes by Aidex, the Court need not decide what effect the use of the term "hazardous substances" has on the scope of § 107(a)(3).

statement that liability under this section "ends with that party who both owned the hazardous waste and made the crucial decision of how it would be disposed of or treated, and by whom." *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842, 845 (S.D.Ill.1984). This statement has been treated as an authoritative description of the outer limits of § 107(a)(3) liability. *See Jersey City Redevelopment Authority v. PPG Industries*, 655 F.Supp. 1257, 1260 (D.N.J.1987); *Developments–Toxic Waste Litigation*, 99 Harv.L.Rev. 1498 (1986). However, this statement was not part of the holding of the *A & F* case; it is dictum which that court used to distinguish the case before it from an unpublished decision involving an indemnity dispute between a purchaser and seller of hazardous materials. *United States v. Westinghouse, supra*. The statement does not accurately characterize the holding of the *Westinghouse* decision, and is inconsistent with the holdings of several other decisions which extend § 107(a)(3) liability to generators who did not "make the crucial decision of how it would be disposed or treated, and by whom." *See, e.g., Violet v. Picillo*, 648 F.Supp. at 1291 (generator who did not choose or know of the ultimate disposal site may be liable under § 107(a)(3)); *United States v. Conservation Chemical Co.*, 619 F.Supp. at 190; *United States v. Ward*, 618 F.Supp. at 895. For these reasons, the *A & F* statement must be viewed in its proper perspective.

■ In response to the defendants' assertion that the plaintiffs' interpretation of § 107(a) would expose a potentially limitless class of manufacturers to liability for cleanup costs, the plaintiffs emphasize that the defendants owned the pesticides throughout the formulation process. While this fact may set these defendants apart from most producers of raw materials, it is not a fact which matters under § 107(a)(3). As the Eighth Circuit impliedly recognized in *United States v. NEPACCO*, liability under § 107(a)(3) is not limited to those who owned the hazardous material at the time of disposal; the only ownership which is necessary is ownership at the time of the arrangement, which is

seldom in dispute. 810 F.2d 726, 743 (8th Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). Thus, the reasoning necessary to extend § 107(a)(3) to cover these defendants cannot necessarily be limited to defendants who owned pesticides throughout the process.

The plaintiffs assert that common law principles of liability provide a legitimate source of insight in resolving this problem, and the Court agrees. When the Senate was grappling with the issue of whether CERCLA should authorize joint and several liability, one of the primary sponsors of the Act stated:

> It is intended that issues of liability not resolved by the Act, if any, shall be governed by traditional and evolving principles of common law. An example is joint and several liability.

126 Cong.Rec.S. 14964 (Daily Ed. Nov. 24, 1980) (Statement of Senator Randolph). A nearly identical statement was made by its principal sponsor in the House. *See* 126 Cong.Rec.H. 11787 (Daily Ed. Dec. 3, 1980). Although the remarks of individual legislators are not controlling, they should be accorded substantial weight, *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979), and have been accorded substantial weight in CERCLA decisions. *See, e.g., United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 807 (S.D.Ohio 1983).

Assuming for purposes of this motion that the plaintiffs can establish that Aidex was acting as an independent contractor for the defendants, those defendants may be liable under common law for physical harm resulting from Aidex' work, even if that harm was not an intended result of the relationship. *See* Restatement (Second) of Torts § 427A (1965):

> One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity.

*See also* §§ 413, 416, 427, 427B.

The Restatement provisions are helpful in two respects. First, they support the

contention that the defendants can be viewed as parties "responsible for creating hazardous waste products", so that the burden of ambiguity of the terms "arranged for" shifts to the defendants, and the Court can demand that they find a specific congressional intent to absolve them of liability. Second, the Restatement provisions provide meaningful standards for resolving liability questions from the common law, the source which the sponsors of CERCLA considered appropriate for deciding questions Congress did not resolve in the Act itself.

■ The Court does not hold that CERCLA and the common law are co-extensive. It merely rules that where the statutory language and legislative history of CERCLA are inconclusive and the legislative history shows that the common law was intended to fill such gaps, the common law is a proper source of guidance. Because it is possible that the plaintiffs can prove a set of facts showing that they are entitled to relief under CERCLA, this portion of the motion to dismiss is denied.

### THE RCRA CLAIMS

In Count 2 of the plaintiffs' complaint, they allege that each defendant (including CIBA–GEIGY and Mobay) is liable for the response costs of each plaintiff under § 7003(a) of RCRA, which states in relevant part as amended.

Notwithstanding any other provision of this chapter, upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to the health or the environment, the administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal to re-

strain such person from such handling, storage, treatment, transportation, or disposal, or to order such person to take such other action as may be necessary, or both.

Plaintiffs contend that "by virtue of their contracts or commercial relationships with Aidex, industry practices and all other relevant circumstances, the defendants have contributed to the handling, storage, or disposal of solid or hazardous waste at the Aidex site which, prior to the response actions by EPA [ ] may have presented an imminent and substantial endangerment to the health or the environment." (U.S. Complaint at ¶ 70; Iowa Complaint at ¶ 70).

■ The defendants challenge this count on two grounds. They contend that § 7003 only authorizes actions filed *while* an imminent and substantial endangerment exists. They find the complaint inadequate because it does not expressly state that the danger persists. Second, the defendants argue that the facts as alleged by the plaintiffs do not make the defendants "contributors" to waste disposal by Aidex.

The first argument can be easily rejected. Plaintiffs seek reimbursement of response costs, a type of claim which is now recognized as one of the "other action[s]" authorized in the first sentence of § 7003(a). *United States v. Price*, 688 F.2d 204, 213–14 (3d Cir.1982). In *United States v. NEPACCO*, 810 F.2d at 749–50, the Eighth Circuit embraced this use of § 7003(a) but in a case in which the claim for reimbursement was filed before the cleanup occurred. However, nothing in the *NEPACCO* decision suggests that this sequence of events was significant, and a common-sense reading of the statute suggests otherwise. The statute requires evidence that conditions "may present" an imminent and substantial endangerment, and "upon receipt of" such evidence, the administrator may bring suit. The statute does not require that the action be filed *while* the danger is present, and in the context of a reimbursement action, this would be an absurd and unnecessary re-

quirement.[5]

■ The argument that the defendants did not "contribute to" the problems at the Aidex site mirrors the defendants' CERCLA arguments in many respects, and presents an equally difficult problem for the Court. However, the Court believes that § 7003 of RCRA was not intended to apply in this context, and therefore must grant this portion of the motions to dismiss.

Unfortunately, the phrase "contributing to" was not defined in RCRA, and "the legislative history of the Act as originally enacted contains no specific discussion of the reach of § 7003 and no mention of the reasons for its insertion." *United States v. Waste Industries, Inc.,* 734 F.2d 159, 165 (4th Cir.1984). Although the legislative histories of the 1980 and 1984 amendments to RCRA constitute legitimate sources of insight into the meaning of the original terms of § 7003, *see NEPACCO,* 810 F.2d at 739, those histories do not shed much light on the meaning of "contributed to" in this context. Those histories do make it clear that § 7003 liability applies regardless of fault or negligence, and that "generators and other persons involved in the handling, storage, treatment, transportation or disposal of hazardous wastes must share in the responsibility for the abatement of the hazards arising from their activities." H.Conf.Rep. No. 1133, 98th Cong., 2d Sess. 119 (1984), reprinted in 1984 U.S.Code Cong. & Admin.News, 5576, 5649, 5690. But strict liability only applies if the plaintiffs have sued the proper defendants, and asking whether the defendants chosen by the plaintiffs were involved in handling or disposing hazardous wastes does not really narrow the question.

As this Court recognized in the previous section, it was necessary to construe § 107(a)(3) broadly in order to avoid frustrating the goals of CERCLA. Because the goals of RCRA are different, the same approach may not apply to § 7003. Even if Congress enacted RCRA for the purpose of permitting the EPA to recover its own cleanup costs, that objective was not important enough to Congress to warrant any mention in the "objectives" portion of the statute and its amendments. *See* RCRA, § 2 and 1984 RCRA Amendments § 101(b), codified at 42 U.S.C. § 6902. As counsel for the United States conceded during this Court's hearing, Congress enacted CERCLA in part because RCRA was not effective in providing a reimbursement scheme. (Hearing Transcript at 41.) As the House report accompanying CERCLA stated: "Deficiencies in RCRA have left important regulatory gaps.... Even [when past sites pose an imminent hazard], the Act is of no help if a financially responsible owner of the site cannot be located." H.Rep. No. 1016, 96 Cong., 2d Sess. 22, reprinted at 1980 U.S.Code Cong. & Admin.News 6119, 6125. Thus, there is no meaningful risk that the Court will frustrate any of Congress' true expectations by failing to use a broad interpretation of the term "contributed to" in an action for clean-up costs against manufacturers.

A narrow reading is especially warranted if a broad reading would cast too wide a net. The United States' interpretation would do exactly that. In arguing that the plaintiffs' interpretation is absurdly overbroad, the defendants assert that it would expose a private citizen who took his car to a body shop to have its brake fluid changed to liability for the costs of cleaning up the site at which the mechanic dumped the used brake fluid. The United States responded:

[A]ssuming that the disposal of brake fluid is inherent in the process of checking brakes, that the owner of the brake fluid had a continuing business relationship with the mechanic to check and dis-

---

5. After this case was submitted, the U.S. Supreme Court ruled that § 505(a) of the Clean Water Act, which allows citizen suits against any person "alleged to be in violation" of specified standards, does not authorize suits for civil penalties for wholly past violations. *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* —

U.S. —, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The Court has reviewed this decision and believes the statutory scheme of RCRA is so different from the Clean Water Act that the decision provides little assistance in resolving this problem.

pose of the brake fluid, that the dumping of the brake fluid gave rise to an imminent and substantial endangerment, *and* that the owner of the brake fluid did not act to ensure proper disposal, then there is no reason why the individual should not be liable to abate the endangerment. (United States Brief at 41.)

The United State's response would be satisfactory if the conditions they placed on their affirmative answer were more far-fetched. While an isolated act of dumping brake fluid might not produce imminent hazard, § 7003 concerns imminent hazards resulting from any number of different acts, and it is very plausible to assume that the regular disposal of brake fluid "may present an imminent and substantial endangerment to health or the environment." Thus, the plaintiffs have not allayed the Court's fears that the plaintiffs' interpretation, if adopted, would put the Court on a very slippery slope.

In the *NEPACCO* decision, the Eighth Circuit held that "it is the authority to control the handling and disposing of hazardous substances that is critical under the [RCRA] statutory scheme." 810 F.2d at 742. The plaintiffs do not allege that any of the defendants had the authority to control how Aidex handled or disposed of the hazardous substances or wastes. While plaintiffs argue that the defendants' ownership of the materials implies authority to control as a matter of law, the Court disagrees. Without such an allegation, the Court does not believe that the plaintiffs have stated a claim under § 7003 upon which relief may be granted. Thus, the defendants' motions are granted with regard to the RCRA counts.

## CERTIFICATION FOR INTERLOCUTORY REVIEW

■ Although this is a motion on the pleadings, it may be the most important order which this Court enters in this action. As the discussion above should demonstrate, the most important question in a § 107 case is usually whether the defendants are potentially liable parties. The Court also recognizes that the standard for liability under CERCLA which this order sets out does not simplify the factual issues in the case. Toxic waste liability cases sometimes require very drawn-out trials, as the three-year trial recently concluded in *Kemner v. Monsanto* (Ill.Dist.Ct.) demonstrated.

Furthermore, it is especially important that potentially liable manufacturers in this field recognize when they may or may not be liable. The EPA is authorized under CERCLA to bring a claim in federal district court to recover up to three times the amount of any costs incurred by the Superfund from any person who is liable for release or a threatened release of a hazardous substance and who fails without sufficient cause to properly comply with an EPA clean-up order. *See* CERCLA § 107(c)(3). Therefore, there is a significant chance that during the time period between the issuance of this order and any order on appeal, many potentially liable manufacturers might well follow this "precedent" regardless of its merit simply out of fear of treble damages. For these reasons, the Court believes that an immediate appeal from this order would not only materially advance the ultimate termination of the litigation, but would also be in the public interest. It goes without saying that this order involves a controlling question of law as to which there is substantial ground for a difference of opinion; this is adequately demonstrated by the voluminous briefs and the absence of any controlling precedent. Although the Eighth Circuit seldom accepts cases for interlocutory review, this Court notes that this order shares the characteristics of decisions the Court of Appeals has accepted for review. *See, e.g., Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987). Accordingly, the Court will certify this order for interlocutory appeal, and suggests that the Court of Appeals accept its certification.

IT IS HEREBY ORDERED that the defendants' motion to dismiss under Rule 12(b)(6) is denied with regard to the CERC-

LA counts (Count 1 of the United States' complaint and Count 1 of the State of Iowa's complaint).

IT IS FURTHER ORDERED that the motion is granted with regard to the RCRA counts (Count 2 of the United States' complaint and Count 2 of the State of Iowa's complaint). All federal claims against Defendants CIBA–GEIGY and Mobil are therefore dismissed.

IT IS FURTHER ORDERED that this order involves a controlling question of law as to which there is substantial ground for difference of opinion, and the Court believes that an immediate appeal from the order may materially advance the ultimate termination of the litigation. The Court therefore certifies the questions raised by the defendants' motions for interlocutory appeal under 28 U.S.C. § 1292(b).