**EDWARD HINES LUMBER COMPANY,**
Plaintiff–Appellant,

v.

**VULCAN MATERIALS COMPANY, et
al., Defendants,**

**Osmose Wood Preserving, Inc.,**
Defendant–Appellee.

No. 88–1403.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1988.

Decided Nov. 7, 1988.

Rehearing Denied Dec. 2, 1988.

Robin R. Lunn, Keck Mahin & Cate, Chicago, Ill., for plaintiff-appellant.

Steven M. Mahoney, Heineke Burke Healy & Bodach, Chicago, Ill., for defendant-appellee.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

After the Edward Hines Lumber Co. sold its wood processing plant in Mena, Arkansas, to Mid–South Wood Products, Inc., the Environmental Protection Agency concluded that the site had been contaminated by toxic substances. Invoking its powers under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–75 (CERCLA or the Superfund Act), the EPA first put the Mena site on the national priority list for attention, 42 U.S.C. § 9605(a)(8)(B), and then asked Hines and Mid–South to remove the offending chemicals, 42 U.S.C. §§ 9604(a), 9606. They signed a consent decree promising to do so and have almost completed work, at a cost close to $5 million. Hines filed this suit to recover from the suppliers of wood preserving chemicals

the expenditures it has lavished on decontamination. The only supplier remaining in the case is Osmose Wood Preserving, Inc., which designed and built the portion of the plant that treated wood with chromated copper arsenate, and sold Hines its requirements of that chemical. The district judge granted summary judgment in Osmose's favor. 685 F.Supp. 651 (N.D.Ill.1988).

Hines initially sought to recover from its suppliers under state tort law. The district court concluded that Hines's suit was untimely, 669 F.Supp. 854 (N.D.Ill.1987), and Hines abandoned these claims. Oddly, Hines did not invoke Osmose's contractual warranty of compliance with all pollution control laws. Hines now wants to recover contribution from Osmose solely under § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), a provision added by the Superfund Amendments and Reauthorization Act (SARA), Pub.L. 99–499, 100 Stat. 1613, 1647, in 1986. It provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims ... shall be governed by Federal law. In resolving contribution claims, the court may allocate response [ = cleanup] costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

Hines may require Osmose to chip in to the decontamination effort only if Osmose is a "person who is liable or potentially liable" under the Act. Osmose's potential liability arises, if at all, under § 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), which provides that (with some defenses and exceptions) "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" must pay the costs of getting rid of them.

■ So everything turns on whether Osmose "owned or operated" the Mena plant. At this point the statutory chain comes to an end, for § 9601(20)(A)(ii) informs us that "[t]he term ... 'owner or operator' means ... in the case of an onshore facility or an offshore facility, any person owning or operating such facility". This is circular, although it does imply that if Mena is neither "onshore" nor "offshore"—perhaps because in outer space?—then an owner or operator is not a statutory "owner or operator". The definition of "owner or operator" for purposes of earthbound sites must come from a source other than the text. The circularity strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings.

A pause for the facts will put the question in perspective. Hines had been preserving wood at its 57–acre site using several different chemicals for nine years before it contracted with Osmose to build an additional plant. Osmose is experienced in using chromated copper arsenate, which, when applied under heat and pressure, makes wood suitable for prolonged exposure to the elements. (The principal product of the plant Osmose built at Mena is 2 × 4 beams used in the construction industry.) For $135,840, Osmose designed and built a plant for Hines's use at Mena; Osmose trained Hines's employees to operate the machinery; it also licensed Hines to use its trademark in connection with treated wood. Hines promised to buy its next five years' requirements of chromated copper arsenate from Osmose and gave Osmose "full and immediate access to the plant and to all chemical processes and products located thereon or produced thereby for the purposes of insuring quality control according to the OSMOSE standards". Osmose promised to construct a closed-loop system, so that the toxic preservative would not escape; it also built the plant on a concrete platform, the better to trap any leaking chemicals. Hines operated the plant between 1976 and 1978; Mid–South has run it since. In 1981 the Arkansas Department of Pollution Control and Ecology found residues of chromated copper arsenate and

other toxic substances in the groundwater near the plant. The EPA's tests in 1984–85 confirmed this finding and identified Mena as the source. Getting rid of the chemicals (while avoiding new deposits) has been expensive.

Osmose designed and built the plant, furnished the toxic chemical, trained Hines's employees, and reserved a right to inspect ongoing operations. This must be enough, Hines submits, to make Osmose an "operator" within the meaning of the Superfund Act. It is easy to see the attraction of sweeping Osmose into the category of responsible persons. Since the facts and inferences must be taken favorably to Hines, the party resisting the motion for summary judgment, we must assume that Osmose came up with a defective design, did not build the plant to standard, trained Hines's employees poorly in how to control the toxic chemicals, and hid all of this from the management at Hines and its successor Mid–South so that they omitted steps that could have rectified the problem sooner and cheaper. When the liability may be large— it is costly to clean up polluted sites—there is a chance that one or more of the firms that have caused the problem will not have the assets necessary to set things right. The prospect of a shortfall in assets means that someone else (the public at large) must incur cleanup costs; victims may be left to bear their own losses; thinly-capitalized firms may take too few precautions. The designation of additional firms as responsible ameliorates this problem and so helps to achieve statutory aims. The prospect of liability under CERCLA would induce a firm in Osmose's position to take greater care in design, construction, and training, all of which would be beneficial (if it did not lead to excessive precautions, which it might).

It is not our function to design rules of liability from the ground up, however. We are enforcing a statute rather than modifying rules of common law. Osmose surely was not an "owner" of the Mena site, so it is potentially liable only if it was an "operator". The statute does not fix liability on slipshod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on-the-job training—and the fact that Osmose might have been all four rolled into one does not change matters. The liability falls on owners and operators; architects, engineers, construction contractors, and instructors must chip in only to the extent they have agreed to do so by contract. To the point that courts could achieve "more" of the legislative objectives by adding to the lists of those responsible, it is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA and SARA do not pursue their ends to their logical limits. See *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1439 (7th Cir.1988). A court's job is to find and enforce stopping points no less than to implement other legislative choices.

The statute does not define "operator", and we turn to common law analogies, as the sponsors of the legislation anticipated. See *Colorado v. ASARCO, Inc.*, 608 F.Supp. 1484, 1488–89 (D.Colo.1985) (quoting statements on the floor of the House and Senate). See also *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1052 (2d Cir. 1985), *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 742–43 (8th Cir.1986), and *United States v. Dart Industries, Inc.*, 847 F.2d 144 (4th Cir.1988), the only other appellate decisions dealing with the definition of "operator"—none of which is helpful in assessing the status of Osmose.

One potential analogy is the distinction between co-venturer and independent contractor. At common law, the employer of an independent contractor is not liable for the contractor's torts, and the contractor is not liable for the employer's. (SARA has turned that outcome 180°, for if the analogy is sound the independent contractor is not an "operator" of the offending *facility* and therefore escapes liability, but the wisdom of this choice is not ours to question.) The dominant characteristic of the independent contractor is day-to-day control of its own operations. *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Restatement (Second)*

*of Agency* § 2(3) (1958). This Osmose had. It designed and built the plant, a turnkey operation on behalf of Hines, which became the operator of the finished facility. Thereafter Hines had day-to-day control, hiring employees, deciding how much to produce, where to sell it and at what price. Osmose hovered in the background, concerned about the quality of the finished product, which could affect its reputation, but did not interfere with operational decisions. So Hines was the operator of the plant as well as its owner, Osmose the independent construction contractor.

A different analogy is the joint venture, which is the one Hines favors. We may assume that the principal operator's co-venturer would be a statutory "operator". Hines thinks that Osmose was so wrapped up in the chromated copper arsenate process that it must be a joint venturer. It offers as the clincher Osmose's contractual right to inspect the plant. The common law definition of a joint venture has at least three elements missing from the arrangement between Hines and Osmose, however: willingness to be joint venturers, shared control, and division of the profits and losses. For cases reciting these elements, among others, see, e.g., *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 416 (7th Cir.1988); *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 13, 151 N.E.2d 170, 178–79 (1958); *Boyer v. First National Bank*, 476 N.E.2d 895, 897–98 (Ind.App. 4th Dist. 1985). Cf. *Forsham v. Harris*, 445 U.S. 169, 180, 100 S.Ct. 977, 984, 63 L.Ed.2d 293 (1980). The contract specified that Osmose was not a partner or joint venturer with Hines. Osmose had no control of the work at the Hines plant, no right to choose employees, direct their activities, or set prices; it had at most a limited veto power—if the product was not up to snuff, Osmose could stop selling chromated copper arsenate and deny Hines the right to use its trademark. The contract assigned exclusively to Hines the responsibility for keeping the plant in compliance with environmental rules. ("Both parties hereto understand and agree that all blowdown and condensats from steam-conditioned charges and outfall of effluent from steam-conditioned charges shall be the responsibility of OWNER.") Osmose had no right to share in the profits and was not required to contribute to the losses, or any other expense. Hines does not allege that Osmose paid part of its workers' compensation claims, for example, or shared in the benefits of improved safety. Hines could have shut the plant or revamped its operation in order to reduce emissions; Osmose could not require Hines to do either. Cf. *Dart*, 847 F.2d at 146 (an agency with a veto power over waste disposal practices is not an "operator" when it does not control the employees or finances of the facility); *Northeastern*, 810 F.2d at 743 (suggesting, without expressly discussing § 9601(20), that "the authority to control the handling and disposal of hazardous substances" is "critical" to the statutory scheme).

So neither the analogy to independent contractors nor the analogy to joint ventures assists Hines. Its reply brief asks us to come up with a new definition, blending elements of common law doctrines to produce one more favorable to Hines. Such efforts often produce nothing but confusion, however. See *Kungys v. United States*, — U.S. —, 108 S.Ct. 1537, 1545–47, 99 L.Ed.2d 839 (1988). A series of small variations on established rules makes law more complex and less predictable. The independent contractor and joint venturer categories have been functional and hence stable. We are unwilling to ring variations on established themes.

The desire of operators to minimize their own liability will lead them to pay close attention to their designers and suppliers. When they lack the expertise to supervise closely, they can induce their contracting partners to take care by insisting on warranties and indemnification. To the extent they anticipate the risks involved—as Hines and Osmose surely knew of the risks of contamination—the outcome of this process is not fundamentally different from the outcome produced by a rule of liability. R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960). The Superfund Act places liability on the "owner or operator"

of the facility. Large potential obligations concentrate the mind wonderfully, leading the owner-operator to assign duties and liabilities by contract to those who can best take precautions. Hines had a warranty and could have bargained for indemnification; if it did not, or if it chose not to enforce the rights it had, Hines has only itself to blame.

AFFIRMED.