UNITED STATES of America, Plaintiff,

v.

CONSOLIDATED RAIL CORPORATION; Sea–Port Services, Ltd., formerly Sealand, Ltd.; Oil Industries, Ltd.; Wayne Hawkins; Chem Clear, Inc.; Coopers Creek Chemical Corporation; Penn Fuel Gas, Inc.; Philadelphia Gas Works; Public Service Electric and Gas Company; and National Industrial Services, Inc., f/k/a Maine Coastal Service, Defendants.

PENN FUEL GAS, INC.; Consolidated Rail Corporation; Chem Clear, Inc.; Coopers Creek Chemical Corporation; Philadelphia Gas Works; Public Service Electric and Gas Company; and Sea–Port Services, Ltd., formerly Sealand, Ltd., Third–Party Plaintiffs,

v.

EKLOF MARINE CORPORATION; Burke–Parsons–Bowlby Corporation; A.M. Lavin Machine Works, Inc.; and Robert Zeigler, d/b/a American Reclamation Refining Company, Third–Party Defendants.

Civ. A. No. 85–502 MMS.

United States District Court,
D. Delaware.

Feb. 2, 1990.

William C. Carpenter, Jr., U.S. Atty., and Richard G. Andrews, First Asst. U.S. Atty., Dept. of Justice, Wilmington, Del. (Michael Goodstein, Dept. of Justice, of counsel), Washington, D.C., for U.S.

Somers S. Price, Jr. of Potter, Anderson & Corroon, Wilmington, Del. (Abbi L. Cohen of Dechert, Price, Rhoades, Philadelphia, Pa., of counsel), for Consolidated Rail Corp.

Wayne Hawkins, Wilmington, Del., pro se.

Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del. (Thomas W. Scott of Killian & Gephart, Harrisburg, Pa., of counsel), for Chem Clear, Inc.

Henry E. Gallagher of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for Coopers Creek Chemical Corp.

C. Scott Reese of Cooch & Taylor, Wilmington, Del. (Robert A. Swift of Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., of counsel), for Penn Fuel Gas, Inc.

Judith N. Renzulli of Duane, Morris & Hecksher, Wilmington, Del. (John W. Walker of Reed Smith Shaw & McClay, Philadelphia, Pa., of counsel), for Philadelphia Gas Works.

William D. Johnston of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Maureen Vaskis, Newark, N.J., of counsel), for Public Service Elec. and Gas Co.

Douglas B. Catts of Schmittinger & Rodriguez, P.A., Dover, Del., for U.S. Printing Ink Corp.

Beth H. Christman of Casarino, Christman & Shalk, Wilmington, Del. (John T. Ward and Thomas J. Minton of Quinn, Ward & Kershaw, Baltimore, Md., of counsel), for Eklof Marine Corp.

William L. Garrett, Jr. of O'Donnell & Garrett, Wilmington, Del. (Robert G. McLusky of Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., of counsel), for Burke–Parsons–Bowlby Corp.

Joseph W. Weik of Czajkowski, Weik & Knepper, Wilmington, Del. (Lewis Kates of Kates & Mozzocone, Philadelphia, Pa., of counsel), for A.M. Lavin Mach. Works, Inc.

Robert J. Katzenstein of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del. (Herbert Pressman of Pressman & Pressman, Philadelphia, Pa., of counsel), for Robert J. Zeigler.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

In 1985, the United States of America brought this action under sections 104(a) and (b) and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9604(a) and (b) and 9607(a), for reimbursement of costs incurred in response to the alleged release of hazardous substances from the Sealand, Ltd. site in Mount Pleasant, Delaware ("the Sealand site"). (Docket Item ["Dkt."] 1 at ¶ 1). The United States asserts claims against defendants alleging liability under section 9607(a)(1) as owners or operators of the facility and/or under section 9607(a)(3) as generators of the waste.[1] On August 6, 1986, seven of the primary defendants filed an amended third-party complaint for indemnification and/or contribution by third-party defendants as owners or operators of the Sealand site, as generators of substances treated or disposed of at the site, or as transporters of such substances who selected the Sealand site for disposal or treatment of the substances. (*See* Dkt. 250).

Third-party defendant, Burke–Parsons–Bowlby ("BPB"), is alleged to have "partic-

ipated in and directed the operation" of the Sealand site. (*See* Dkt. 250 at ¶ 37). Third-party plaintiffs seek contribution from BPB as an entity which is liable under CERCLA. Operator liability and generator liability are asserted pursuant to 42 U.S.C. §§ 9607(a)(2) and (a)(3), respectively. (Dkt. 250 at ¶ 39). Contribution from BPB is sought under 42 U.S.C. § 9613(f)(1) which can be obtained from any person who is "liable or potentially liable" under CERCLA. Third-party defendant, Eklof Marine ("Eklof") is alleged to have arranged for disposal or treatment of coal tar[2] at the Sealand site. (Dkt. 250 at ¶¶ 33 and 35). Generator liability is asserted pursuant to 42 U.S.C. § 9607(a)(3). (Dkt. 250 at ¶ 39). In this decision, I address both motions for summary judgment. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this case arises under 42 U.S.C. §§ 9607 and 9613(b).

For the reasons set forth below, both BPB's and Eklof's motions for summary judgment will be granted. Where, as in this case, the third-party defendant is not liable under CERCLA as either an operator or a generator, the third-party plaintiffs have no claim for contribution or indemnity. Thus, the contribution claims against BPB will also be dismissed.

## I. FACTUAL BACKGROUND

BPB is a West Virginia corporation based in Ripley, West Virginia which produces pressure-treated wood products used in the home, highway and railroad construction industries. (Affidavit of Norman Hildreth [Vice–President of Production of BPB, hereinafter "Hildreth Aff."], Dkt. 436, Exhibit 1 at ¶ 2). It has production

---

**1.** The United States claims that from September, 1982, until about August, 1983, defendants, Sea–Port Services, Ltd. (f/k/a Sealand, Ltd.) and Oil Industries, both serving as alter egos for defendant Wayne Hawkins (a/k/a Joseph Quigley) operated a waste oil recycling business on property owned by defendant Consolidated Rail Corporation which resulted in releases of hazardous substances. (Dkt. 1 at ¶¶ 14–16).

The United States also claims that defendants Chem Clear, Inc.; Coopers Creek Chemical Corporation; Penn Fuel Gas, Inc.; Philadelphia Gas

Works; and Public Service Electric and Gas Company were waste generators in that they arranged for disposal or treatment of hazardous wastes they owned or possessed at the Sealand site. (Dkt. 1 at ¶ 17).

**2.** Coal tar is a type of hydrocarbon waste material ("oil") that is derived from the destructive distillation of coal. It is used in many dyes, drugs, and organic chemicals and for waterproofing paints, roofing and insulation materials.

facilities in DuBois, Pennsylvania; Goshen, Virginia; Wilmington, North Carolina; Stanton, Kentucky; and Spencer, West Virginia. (*Id.*) Among the items produced by BPB are bridge timbers and railroad cross-ties, both of which are treated with various mixtures of coal tar and creosote. (*Id.*)[3]

In approximately 1982, Hildreth learned that Philadelphia Electric Company ("PECO") had waste coal tar available at its Chester, Pennsylvania plant. (*Id.* at ¶ 5). Hildreth discussed with PECO the possibility of setting up a processing facility at the PECO plant by which BPB could separate excess water from the material prior to transport. (*Id.*) However, PECO preferred to seek bids for the sale of the coal tar. (*Id.*) BPB elected not to submit a bid on the coal tar. (*Id.*)

Later in 1982, Hildreth contacted PECO to determine whether it had sold its coal tar. (*Id.*) He was given the name and telephone number of Wayne Hawkins.[4] (*Id.*) Hildreth then called Hawkins to discuss purchasing treated coal tar for use in its wood preservation business. (*Id.* at 6). In May 1982, BPB agreed to purchase coal tar products supplied by Sea–Port containing no more than 5 percent water. (*Id.*)

Initially, Sea–Port arranged for BPB to pick up loads of coal tar from Eklof Marine in Staten Island, New York. (*Id.* at ¶ 7). Eklof is a marine transportation corpora-tion which operates a fleet of barges and tankers out of Staten Island, New York which transports oil and other liquids along the east coast. (Affidavit of Carl Eklof, Sr. [Vice President of Eklof, hereinafter "Eklof Aff."], Dkt. 458, Appendix A, Exhibit 1 at ¶ 3). In early 1982, M.R. Trading[5] contracted with Eklof to transport waste oil from Boston to Philadelphia. (*Id.* at ¶¶ 6–8; *accord* Affidavit of Julius M. Meyer [owner of M.R. Trading, hereinafter "Meyer Aff."], Dkt. 458, Appendix A, Exhibit 2 at ¶ 4). After the material was on Eklof's barges, water content was found to be greater than expected[6] and the material was rejected by the intended purchaser, Diamond Petroleum Company.[7] (*Id.* at ¶ 3). Because the deal with Diamond had fallen through and Diamond was obligated to pay Eklof directly, Eklof was unable to receive its transport fee. (*Id.* at ¶ 5).

Meyer therefore instructed Eklof to take the oil to its facilities on Staten Island and hold the oil aboard the vessel. (Eklof Aff., Dkt. 458, Appendix A, Exhibit 1 at ¶ 9). From time to time, Eklof was required to transfer the oil from one barge to another to make various barges available for use, repair or inspection. (*Id.* at ¶ 10).

According to third-party plaintiffs Eklof was actively seeking prospective buyers in order to recoup their costs[8] and be rid of

---

3. Coal tar, which is mixed with creosote to treat certain wood products, is produced from the coking of coal. (Hildreth Aff. at ¶ 2). This process, which involves heating coal in the absence of oxygen, was a common one at gas plants throughout the northeast region of the United States. (*Id.* at ¶ 4).

4. The United States contends that Wayne Hawkins was president of defendants Sea–Port Services, Ltd. and Oil Industries, Ltd. (Dkt. 1 at ¶ 7). By an agreement of lease dated August 24, 1982, Conrail, the owner of the Sealand site, leased the site to Sea–Port. (Dkt. 1 at ¶ 15; and Dkt. 1, Exhibit 1). The lease agreement bears the signature of "Wayne Hawkins" as president of Sea–Port and provided that the lessee's purpose was to use the property "as a site for the storage and processing of residual oil." (Dkt. 1, Exhibit 1 at 2).

5. M.R. Trading was a d/b/a of Julius M. Meyer based in Atlanta, Georgia. Meyer was a broker of waste products such as waste oil. (Affidavit of Julius M. Meyer [hereinafter "Meyer Aff."],

Dkt. 458, Appendix A, Exhibit 2 at ¶ 1). In March, 1982, Meyer agreed with JABCO (a one man pollution abatement operation run by Jason Baker) to broker the sale of coal tar from Lowell Gas of Massachusetts to Diamond Petroleum Company of Pennsylvania. (*Id.* at ¶¶ 2–3).

6. JABCO analyzed the coal tar at Lowell Gas and determined that it contained less than 10 percent water. After the material was loaded onto the barges, it was retested and found to be greater than 10 percent water. There is some question as to whether the excess water was caused by Eklof. (Deposition of Julius M. Meyer [hereinafter "Meyer Dep."], Dkt. 460A at 61).

7. Waste oil containing less than 10 percent water was valuable to Diamond because of its BTU value.

8. As of October 12, 1982 Eklof submitted invoices to M.R. Trading totalling $100,200.00 for expenses relating to storage and transport of the oil. (Dkt. 458, Appendix A, Eklof Exhibit 3).

the oil which was tying up the barges.[9] (*See* Dkt. 460 at 10–12).

During this time Robert Zeigler (d/b/a American Reclamation Refining Company) was retained to broker oil for Sea–Port. Zeigler contacted Eklof to verify there was material he wanted to unload from his barge.[10] (Deposition of Robert J. Zeigler [hereinafter "Zeigler Dep."] Dkt. 460A at 11–12). This resulted in a contract for the sale of the oil in Eklof's barges between Sea–Port, as buyer, and Eklof and M.R. Trading, as sellers. (Dkt. 458, Appendix A, Exhibit 2, Meyer 1). Eklof would receive $.04 per gallon and M.R. Trading would receive $.02 per gallon. (*Id.*) In fact Eklof never received any payment for the oil. (Dkt. 387 at ¶ 3). Eklof shipments totalling 150,000 gallons from Eklof to Sealand, Ltd. or Sealand's purchaser were made beginning in June, 1982 and ending the summer of 1983.[11] (Eklof Aff., Dkt. 458, Appendix A, Exhibit 1 at ¶ 8).

After obtaining several loads of material from the Eklof facilities on Staten Island,[12] BPB determined that the coal tar's water content was greater than five percent such that the material required reprocessing at BPB's individual production facilities to drive off the excess moisture. (*Id.* at ¶ 8). When Hildreth complained, Hawkins stated

that although his contractor was not doing an acceptable job, Sea–Port would soon be operating its own production facility in the Mount Pleasant, Delaware area. (*Id.*)

From September, 1982 to August, 1983 BPB obtained coal tar directly from the Sealand site. That facility was a remodeled tank farm that had previously been used in the distillation of animal fats. (*Id.* at ¶ 9). Hildreth visited the Sealand site once before it was operational and thereafter approximately ten to twelve times. (*Id.* at ¶¶ 9, 11). On his initial visit the site consisted of a building containing office and storage space and a series of approximately twenty 20,000 gallon tanks which could be used for both storage and heating of coal tar. (*Id.* at ¶ 9).

Because BPB was familiar with the use of coal tar, Hildreth provided Hawkins with some technical support for refitting the plant. (Deposition of Steven Hawkins, [nephew of Wayne Hawkins who was Manager of the Sealand facility; hereinafter "S. Hawkins Dep."], Dkt. 436, Exhibit 3 at 159). On one occasion he gave a toluene extraction unit to Sealand for their use in determining water content. (Hildreth Aff. at ¶ 11). In addition, most of the names of suppliers for raw material were suggested

---

Meyer responded by letter of April 22, 1983 that he was unable to pay this obligation. (Dkt. 458, Appendix A, Exhibit 4). Eklof did not assert, nor did Eklof seek to assert, any lien on the coal tar. (Eklof Aff., Dkt. 458, Appendix A, Exhibit 1 at ¶ 12).

9. There is a dispute as to whether Eklof was seeking purchasers for the oil. When questioned about the understanding between Eklof and M.R. Trading after the Diamond sale fell through, Meyer testified:

Q. Do you know what instructions were given to Eklof once Diamond did learn of the higher water content?
A. Well, at that point we both decided we would have to try to get rid of the product the best way possible, and I tried to find some buyers for it, and Eklof was looking for buyers for it.

(Meyer Dep., Dkt. 460A at 42). However, Eklof maintains that Eklof Marine was "powerless to affect the sale in any way." (Eklof Aff., Dkt. 458, Appendix A, Exhibit 1 at ¶ 14).

10. When questioned about his contact with Eklof on behalf of Sea–Port, Zeigler testified:

Q. What happened?
A. Then at a later time I made another phone call and did in fact get in touch with Mr. Eklof.
Q. What was the substance of the conversation?
A. Just verification that there was material that he wanted to unload from his barges and he didn't know how much water was in there. He didn't have any real indepth knowledge. So I agreed to go and get a sample so we could check for the water content.

(Zeigler Dep., Dkt. 460A at 22).

11. Third-party plaintiff alleges that approximately 80,000 gallons of the oil went to the Sealand site. (Dkt. 389 at ¶ 5). The rest of the material was transported directly from Eklof's barge to the ultimate purchaser Burke–Parsons–Bowlby. (Transcript of Oral Argument, Dkt. 466 at 49–50).

12. Timber Trucking Company, a wholly owned subsidiary of BPB, picked up this material and delivered it, as needed, directly to BPB's production facilities. (Hildreth Aff. at ¶ 7).

by Hildreth. (S. Hawkins Dep. at 164–66; *accord* Hildreth Aff. at ¶ 14).

The coal tar and other material were shipped by vacuum truck to the Sealand site. The material was then heated, processed and the excess water evaporated. (*Id.* at ¶ 9). Once the water was removed from the material, it was then shipped to BPB and Hawkins was paid for his services. (*Id.* at ¶ 12). BPB received the coal tar at less than one-half market price. (Deposition of Norman Hildreth, Dkt. 448A, Exhibit 4 at 90–91).

## II. DISCUSSION

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if, upon a review of the materials properly before the court, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment may be granted in spite of some alleged factual disputes between the parties because Rule 56(c) requires only that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a court must view the evidence in the light most favorable to the non-moving party, *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983), the court must grant summary judgment "against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986).

I will first address an evidentiary issue as to the sufficiency of an affidavit of Wayne Hawkins relied upon by third-party plaintiffs in opposition to BPB's motion for summary judgment. Then, I will address the application of CERCLA liability to both third-party defendants.

### B. *Sufficiency of the Affidavit of Wayne Hawkins*

■ A large portion of the facts presented by third-party plaintiffs to establish BPB's liability depends entirely upon an *ex parte* interview that third-party plaintiffs conducted with Wayne Hawkins. (*See* Dkt. 448A, Exhibit 2.) Hawkins (a/k/a Joseph Quigley) is a convicted felon who pleaded guilty to seventeen counts involving theft of services by false promises relating to the Sealand site. (*See* Dkt. 452A, Exhibit 1.)

Although this interview was taped unsworn, third-party plaintiffs attempted to cure the defect in the interview procedure by entering it into the record with an affidavit by Hawkins on April 12, 1988. (Dkt. 448A, Exhibit 2). In this affidavit, Hawkins states with respect to that transcript:

> 2. The information contained in the 27 page statement (document attached hereto) is true and correct to the best of my knowledge, information, and belief.

(*Id.*)

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits used to oppose a summary judgment motion:

> shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein....

The rule established in the Third Circuit is that affidavits made on information and belief are not sufficient to rebut a properly offered motion for summary judgment. *See, e.g., Williams v. Borough of West Chester, Pennsylvania,* 891 F.2d 458 (3d Cir.1989) (Garth, J., concurring); *Bushman v. Halm,* 798 F.2d 651, 660 (3d Cir.1986); *Gostin v. Nelson,* 363 F.2d 371, 371–72 (3d Cir.1966) (disregarded affidavit based on information and belief).

■ Third-party plaintiffs argue that the appropriate remedy for such defects is to strike the improper passages, but not the affidavit as a whole. *Clayton v. James B. Clow & Sons,* 154 F.Supp. 108 (N.D.Ill. 1957). In the circumstance where the entire affidavit is not challenged, the court in appropriate circumstances can sort through the hearsay and conclusions, rendering

them the credibility deserved. However, where as here, the entire document is called into question, the court need not cull the affidavit to determine as to each statement whether the affiant has the requisite knowledge.

Third-party plaintiffs have had four years to establish this record, such that the failure to properly support the transcript of a principal defendant while explainable [13] does not relieve them of the obligation to comply with Federal Rule of Civil Procedure 56(e). Accordingly the Wayne Hawkins affidavit may not be considered in resolving BPB's summary judgment motion.

#### C. *CERCLA Liability under § 9607(a)*

CERCLA places the ultimate responsibility for clean up on "those responsible for problems caused by the disposal of chemical poisons." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986). Section 107 of CERCLA authorizes recovery against four classes of parties:

a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous wastes were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... se-

lected by such a person ... shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607 (1982).

Congress enacted CERCLA as a comprehensive response to the problem of hazardous wastes. Through CERCLA Congress intended to provide an effective response to the hazardous waste problems and to force those responsible for creating hazardous wastes to bear the costs of their actions. *Violet v. Picillo*, 648 F.Supp. 1283, 1288 (D.R.I.1986). Congress extended liability to the four classes of persons described by section 107(a)(1)–(4). Once determined to be a member of a class, liability under CERCLA is strict, without regard to fault or state of mind. *U.S. v. Ward*, 618 F.Supp. 884, 893 (D.N.C.1985).

In this case, third-party plaintiffs assert that BPB's involvement with the Sealand site constituted that of an owner or operator of a hazardous waste facility (section 107(a)(2)) and/or that of a generator who arranged for disposal of hazardous wastes (section 107(a)(3)). Third-party plaintiffs assert that Eklof's involvement with Sea-Port constituted that of a generator.

##### i. Operator Liability under § 9607(a)(2)

Third-party plaintiffs seek to impose liability on BPB as a party who "owned or operated" a hazardous waste facility. In their motion for summary judgment, BPB contends that the undisputed facts demonstrate as a matter of law that they never operated the Sealand facility and therefore can not be subject to CERCLA liability as an operator.

"[T]he term 'owner or operator' means ... any person who owned, operated, or otherwise controlled activities at such facility.... Such term does not include a per-

---

**13.** At oral argument counsel for third-party plaintiffs explained that Wayne Hawkins stated he would raise the Fifth Amendment if an effort were made to take his deposition.

son, who, without participating in the management, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). Only those who "actually operate or exercise control over the facility that creates an environmental risk can be held liable under CERCLA for the costs of reducing that risk." *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 657 (N.D.Ill.1988).

■ Although interpreted broadly, the statute requires that a person be actively participating in the management of the facility to be held liable for the disposal of hazardous wastes. The "mere ability to exercise control as a result of the financial relationship of the parties is insufficient for liability to attach. The entity must actually exercise control." *United States v. Mirabile*, 10 Chem. & Rad.Waste Lit.Rep. 688, 670–71 (E.D.Pa.1985). *Cf. United States v. Northeastern Pharmaceutical and Chemical Co., Inc.*, 579 F.Supp. 823, 849 (W.D. Mo.1984), *aff'd in part, rev'd in part*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1988) ("*NEPACCO*") (suggesting mere capacity to control is sufficient for liability to attach).

BPB relies upon the decision in *Edward Hines Lumber Company v. Vulcan Materials Company*, 685 F.Supp. 651 (N.D.Ill. 1988), *aff'd* 861 F.2d 155 (7th Cir.1988), where defendant Osmose was dismissed from the case because it was not an operator. In that case, Hines, a wood products manufacturer and owner of a CERCLA site, sought to impose "operator" liability on Osmose. The record established that Osmose had designed the plant for Hines; designed, constructed and installed a chromated copper arsenate ("CCA") treatment system; trained the personnel to run the facility; supplied the CCA for the system; provided technical and marketing assistance; and retained the right of access to the facility. *Edward Hines Lumber*, 861 F.2d at 156. The Court held that Osmose did not exercise sufficient control over the site to be an operator, finding that it had at most a right of access to the facility. *Ed-*

*ward Hines Lumber*, 685 F.Supp. at 656–57; 861 F.2d at 157–58.

In *Rockwell Intern. Corp. v. IU Intern. Corp.*, 702 F.Supp. 1384 (N.D.Ill.1988), the court distinguished *Edward Hines Lumber* to find operator liability where the defendant hired or approved the hiring of certain corporate officers that had remained in charge of the facility through the various changes in ownership among the defendant's subsidiaries. In addition, the defendant's executives established the procedure for and approved the operational plans, monitored performance of the facility, and suggested changes in procedures that directly affected the disposal of hazardous substances. *Rockwell* at 1391.

Third-party plaintiffs maintain that BPB played an active role in the operation of the Sealand site and had control of the hazardous substances that were being processed. In this case, BPB's involvement was on both sides of the transaction, setting up the facility and purchasing the output. It is not disputed that BPB purchased all of the output from the Sealand site and pre-approved the shipments of raw coal tar coming into the Sealand facility. Third-party plaintiffs argue that these two facts imply that BPB "controlled" the flow of material to Sealand supporting the inference of an active role, or capacity for an active role, in day-to-day operations at the facility.

There is no testimony in the summary judgment record to support that inference. Moreover, pre-approval of raw coal tar shipments into the Sealand facility and buying its output does not constitute operating or exercising control at the Sealand facility.

Third-party plaintiffs also urge that buying the coal tar from Sealand at less than one-half of the market price taken together with the giving of technical advice and one piece of equipment gives rise to an inference that BPB was in a joint venture with Hawkins. The only evidence in the summary judgment record belies the existence of a joint venture. Third-party plaintiffs posed an interrogatory inquiring of Hawkins who, among other things, participated in the business operations of Sealand as follows:

3. Describe the nature of the business operation conducted by Sealand at the Sealand site from 1982 to the present, including:

(d) the identity of any person who witnessed, *participated in, had any role or responsibility in, or had or has any knowledge of the business operations conducted by Sealand* at the Sealand site and a description of their participation, role responsibility, or knowledge.

*Response:* Bhodan Tanchuck, Danny Royal, owners; *Stephen Hawkins, plant operator;* Wayne Hawkins, Independent Consultant.

(Dkt. 452A, Exhibit 2). Notably missing from the response is any reference to BPB.

Under Delaware law a joint venture "has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership for their mutual benefit, in which they combine their property, money, effects, skill and knowledge." *J.L. Johnson, Inc. v. Carmer,* 38 Del.Ch. 579, 156 A.2d 499 at 502 (1959). In addition to contributing to the enterprise, each joint venturer must share profits and losses and have a proprietary interest in the venture. *Id.* 156 A.2d at 503. In the CERCLA context, one appellate court has stated a prerequisite to finding a joint venture is a "willingness to be joint venturers, share control, and division of profits and losses." *Edward Hines Lumber,* 861 F.2d at 158.

There is no joint venture either under the Delaware judicial definition of a joint venture or under CERCLA case law. While the favorable price at which BPB bought the coal tar might give rise to an inference of sharing of profit, Hawkins' answer to the interrogatory quoted above negatives a willingness to be joint venturers, a proprietary interest by BPB or a sharing of control by BPB. In addition, the record is devoid of any agreement to share losses. It is concluded BPB and Wayne Hawkins were not engaged in a joint venture.

Although liability would support the broad goals of CERCLA, "[i]t is enough to respond that statutes have not only ends but also limits. Born of compromise, laws such as CERCLA ... do not pursue their ends to the logical limits." *Edward Hines Lumber,* 861 F.2d at 157. On this record, BPB's motion for summary judgment that BPB was not an operator of the Sealand facility under 42 U.S.C. § 9607(a)(2) must be granted.

ii. Generator Liability under § 9607(a)(3)

The language of section 9607(a)(3) extends liability to persons who "by contract, agreement, or otherwise arranged for" the disposal of hazardous substances. While the legislative history of CERCLA sheds little light on the intended meaning of this phrase, courts have concluded that a liberal judicial interpretation is consistent with CERCLA's "overwhelmingly remedial" statutory scheme. *See United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1379–82 (8th Cir.1989). In order for there to be liability under section 9607(a)(3) a person need not have generated the hazardous substances, *United States v. Bliss,* 667 F.Supp. 1298, 1306 (E.D.Mo.1987), and a person need not have actual ownership or possession of the waste. *United States v. Ward,* 618 F.Supp. 884, 890 (E.D.N.C.1985); *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.,* 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part, rev'd in part,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1988) (*NEPACCO*). The inquiry under section 9607(a)(3) turns on the determination of who made the crucial decision to dispose of hazardous substances under the Act, and thus falls within the class of responsible persons described in section 9607(a)(3). *Jersey City Redevelopment Authority v. PPG Industries,* 655 F.Supp. 1257, 1260 (D.N.J.1987), *citing United States v. A & F Materials,* 582 F.Supp. 842, 845 (S.D.Ill.1984). "It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme." *NEPACCO,* 810 F.2d at 743.

The decision to dispose is not merely limited to the determination of where the

hazardous substances would be disposed or treated. *See United States v. Ward*, 618 F.Supp. 884 (E.D.N.C.1985). In that case, the court found generator liability in part because the defendant "clearly intended to have Burns, [an individual hired by the defendant], 'get rid of' the PCB-laden oil which had become a problem for him to maintain on ... [the] premises." *Id.* at 895. Thus, liability may also be extended to generators "who did not make the crucial decision of how [the substances] would be disposed or treated, and by whom," *United States v. Aceto Agricultural Chemicals Corp.*, 699 F.Supp. 1384, 1389 (S.D.Iowa 1988), *aff'd in part, rev'd in part*, 872 F.2d 1373 (8th Cir.1989), where "[a]ny other decision ... would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA." *Id.* at 1382.

Third-party plaintiffs seek to impose liability on both BPB and Eklof as generators of hazardous wastes. Third-party plaintiffs allege that BPB had control over the decision to accept wastes for disposal or treatment at the Sealand site. Similarly, third-party plaintiffs assert that Eklof made the decision to dispose of the coal tar at the Sealand facility evidenced by the alleged negotiation of that sale.

### a. *Generator Liability as to BPB*

■ Third-party plaintiffs argue that BPB's agreement with Sea–Port embodied an arrangement for the disposal or treatment of hazardous substances at the Sealand site. BPB contends that this analysis fails because they did not control the decision to place the waste in the Sealand facility. Third-party plaintiffs have only established that Hildreth provided Hawkins with the names of potential raw coal suppliers. (Hildreth Aff. at ¶ 14). There is no evidence that Hildreth made the decision to dispose of hazardous substances or performed any role in deciding which suppliers would sell to Sea–Port or providing coal tar directly to Sea–Port.

Third-party plaintiffs also assert that BPB should be held to generator liability as a formulator of hazardous wastes. In *U.S.*

*v. Aceto Agr. Chemicals Corp.*, 699 F.Supp. 1384 (S.D.Iowa 1988), *aff'd in part, rev'd in part*, 872 F.2d 1373 (8th Cir.1989), the Court denied defendants' motions to dismiss where defendants processed pesticides at the Aidex facility and received the end product. The Court found that the "formulator [Aidex] is more of an independent contractor than a purchaser, because the manufacturer normally maintains ownership of the technical grade pesticide, the work in progress and the commercial grade pesticide even after possession passes to the formulator." *Aceto* at 1387. *See also United States v. Velsicol Chemical Corporation*, 701 F.Supp. 140, 142 (W.D.Tenn.1987) (finding generator liability where defendants arranged for Arlington Blending to formulate and package products and defendant knew or should have known that there would be losses through spills or leaks and that wastes would be generated in the formulating process).

Third-party plaintiffs argue that BPB should be held liable as a generator under the *Aceto* standard. The record establishes that BPB assisted in locating the raw material inputs for the Sealand operation and received the output at rates substantially lower than market prices. In addition, BPB was the only one who received the coal tar from the operation of the Sealand site. Third-party plaintiffs combine these facts to infer that the Sealand facility was operated by BPB for the benefit of BPB indicating an implied relationship between Sea–Port and BPB akin to that in *Aceto.*

BPB contends that this analogy fails because in *Aceto* the raw materials were owned by the defendants and then shipped to Aidex for formulation. There is no such evidence in this case. In fact, although BPB did purchase all of the output from the Sealand facility, there is no evidence of a contractual obligation on the part of BPB to accept all of the output from the Sealand facility. The letter of agreement states:

> This is to confirm that The Burke–Parsons–Bowlby Corporation will purchase the hydrocarbon products supplied by

Sealand, Ltd. ... on a month to month basis for one year.

(Dkt. 436, Exhibit 1).

Although CERCLA was meant to be interpreted broadly, on this record there is no support for the inference that BPB controlled or had the authority to control the hazardous substances disposed or treated at the Sealand site. Therefore, BPB's motion for summary judgment that BPB was not a generator of the hazardous substances at the Sealand facility under 42 U.S.C. § 9607(a)(3) will be granted.

### b. *Generator Liability as to Eklof*

■ Third-party plaintiffs contend that Eklof negotiated the deal to sell the coal tar to Sea–Port. The sole evidence relied upon by third-party plaintiffs to support this allegation is that Eklof's signature appears on the purchase order as a seller of the oil. Eklof by affidavit disputes whether an adverse inference may be drawn based on that signature. Eklof maintains that Eklof's signature only appears on the purchase order to acknowledge that Eklof considered the debt owed by M.R. Trading to be satisfied by the agreement of Sea–Port to pay directly to Eklof $.04 per gallon out of the purchase price. (Eklof Aff., Dkt. 458, Appendix A, Exhibit 1 at ¶ 15).[14] The Eklof affidavit goes on to state:

> The sale to Sealand was completely arranged by Meyer, without the participation or prior knowledge of Eklof. Neither Eklof nor any representative of Eklof participated in any of the negotiation leading to that sale, had any voice in the sale, or participated in negotiations of the sale price or other terms.... Eklof had no role in the decision to sell. It was my understanding that Eklof was powerless to affect the sale in any way.

(Eklof Aff., Dkt. 458 at ¶ 14).

Eklof argues that Eklof's affidavit demonstrates that Eklof was never the owner of the coal tar in question and that Eklof never exercised any decision making power

with respect to the ultimate disposition of the oil. (Dkt. 458 at 2). Eklof contends that the evidence, primarily of its signature on a single bill of sale, is insufficient to implicate Eklof as an active participant in arranging for disposal at the Sealand site and thus subjecting Eklof to CERCLA liability. (*See* Dkt. 458 at 7).

Third-party plaintiffs assert that both Zeigler and Meyer believed Eklof negotiated the deal with Sea–Port. When questioned about Eklof's role in negotiating the sale of the oil, Zeigler stated:

Q. And based on what you learned or what the test revealed, what happened concerning the price, the purchase price that's reflected in the purchase order?

A. Well, that was decided on between Quigley and Eklof Marine?

Q. I thought you said that Meyer had suggested the price.

A. Meyers (sic) suggested the price, but then the negotiation had to be between Eklof and Sea–Land (sic) the final negotiation.

(Zeigler Dep., Dkt. 460A at 27). However, as Zeigler continues his testimony fails due to lack of personal knowledge.

Q. So that the question again is, you really don't know what Eklof did in terms of negotiation.

A. No, I don't.

Q. And Quigley never told you what Eklof did in terms of negotiation.

A. Only that there was a price established and that was it. And I had to assume it was negotiation.

Q. You assumed negotiation but in other words, *you don't know how this whole deal was arranged.*

A. No.

(Zeigler Dep., Dkt. 461, Exhibit 1 at 68) (Emphasis added). Zeigler himself had no role in conducting negotiations:

---

**14.** Meyer stated Eklof's signature appears on the bill of sale because he was owed money by M.R. Trading. (Meyer Aff., Dkt. 458, Appendix A, Exhibit 2 at ¶ 7). However, Meyer's statement in the affidavit is weakened by his deposition

testimony which, when fairly read, calls into question whether Meyer had direct knowledge of any of the circumstances surrounding Sea–Port's purchase of the oil. *See infra,* p. 1472.

Q. You didn't participate in the negotiation of the terms of the purchase order.

A. Only to the extent of supplying that handwritten note and some verbal information I received from Meyers (sic), and that was up to Quigley to give him the purchase order.

(Zeigler Dep., Dkt. 461, Exhibit 2 at 72).

Meyer's testimony is also faulty. In establishing Eklof's role in arranging the sale, Meyer testified:

Q. Did Eklof know where the material which was in its barges was going?

A. He would have to know ultimately if he was disposing of it.

Q. Would I be correct if I said that as far as you know, Eklof arranged for the disposal of the coal tar in its barges?

A. I would say that would be correct.

．　　．　　．　　．　　．

Q. And as far as you were concerned, Eklof could do anything that it wanted to do to recoup any investment that it had in the coal tar?

A. He had possession of the product, that is correct.

．　　．　　．　　．　　．

Q. And when Eklof Marine entered into the agreement with Sealand, that was fine with you because that would get Eklof off your back?

A. That is absolutely right.

(Meyer Dep., Dkt. 460A at 61–62). However, these statements are diminished by Meyer's other testimony that he had no recollection of who negotiated the deal. Meyer testified:

Q. Is it your testimony today that you do not know how that sale was negotiated?

A. I'm really not sure about how it was negotiated.

Q. Is it possible that you negotiated the sale?

A. I'm not sure.

Q. Is the answer yes or no, is it possible that you negotiated the sale?

A. Anything is possible.

Q. Is it possible?

A. Certainly it's possible.

Q. You just don't recall?

A. I don't recall.

(Meyer Dep., Dkt. 458, Exhibit 3 at 52). Meyer further stated that:

Q. And it may have been you who located Sealand?

A. It could have been through one of my other people.

Q. And it may have been you who negotiated the terms of this purchase order?

A. It's possible. I just do not recollect.

(*Id.* at 67).

The most expansive reading of generator liability still requires that Eklof take some affirmative action to dispose of the waste that resulted in deposit or treatment at the Sealand site. In opposing the motion for summary judgment, third-party plaintiffs bear the burden of countering the sworn statement of Eklof with some affirmative evidence to support their contention that Eklof did participate in the decision to dispose of the oil. The fact that Eklof Marine wanted the oil off its barge is not enough.

The summary judgment record boils down to the following. An inference may be drawn from Eklof's signature on the bill of sale that Eklof Marine owned the oil and participated in negotiations to sell it. However, Eklof by affidavit has stated he was not the owner of the oil, did not participate in any fashion in the sale of the oil to Sealand and was powerless to effect the sale to Sealand.[15] Thus, unless testimony of Zeigler and Meyer may be used to rebut the Eklof affidavit, Eklof's position set forth in his affidavit is uncontroverted. Third-party plaintiffs assert that an inference may be drawn from the failure of Meyer to recollect the event, indicating that Meyer was not involved. The problem with third-party plaintiff's position is an inference that Meyer was not involved is a far

---

**15.** If Eklof's deposition were taken, it is not part of the summary judgment record.

cry from saying Eklof participated in or negotiated the sale. Moreover, as set forth *supra,* pp. 1471–1472, Meyer and Zeigler do not know how the sale was arranged. The statements of Meyer and Zeigler are not based upon personal knowledge as required by Fed.R.Civ.P. 56(e). Therefore, they cannot be employed to contradict or in any way weaken the Eklof affidavit. As a result, on this summary judgment record Eklof's affidavit is uncontradicted. The only inference that may be drawn from Eklof's signature on the bill of sale is that set forth in the Eklof affidavit. Therefore, Eklof's motion for summary judgment that it was not a generator of the hazardous substances at the Sealand facility under 42 U.S.C. § 9607(a)(3) will be granted.

An order will be entered granting both motions for summary judgment.