United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 17, 1998 Decided May 1, 1998

 No. 97-5079

 East Bay Municipal Utility District, 

 Appellant

 v.

 United States Department of Commerce, et al., 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 93cv01715)

 Andrew L. Lipps argued the cause for appellant. With 
him on the briefs were Leonard A. Miller and William J. 
Mertens.

 Joan M. Pepin, Attorney, U.S. Department of Justice, 
argued the cause for appellees. With her on the brief were 
Lois J. Schiffer, Assistant Attorney General, Edward J. Sha-


waker and Martin F. McDermott, Attorneys. John T. Stahr, 
Attorney, entered an appearance.

 Before: Williams, Henderson and Garland, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: The East Bay Municipal Utility 
District (the "District") found itself saddled with the costs of 
cleaning up hazardous waste from an abandoned mine site, 
Penn Mine, in Northern California. As owner of part of the 
site, which it acquired in developing its reservoir system, 
the District had become responsible for these costs under 
CERCLA, the Comprehensive Environmental Response, 
Compensation, and Liability Act, 42 U.S.C. s 9601 et seq. 
Understandably interested in finding another source of funds 
to share the burden, the District claimed that the federal 
government was responsible for the waste as an "operator" of 
the mine, pursuant to CERCLA s 9607(a)(1), or alternatively 
as an "arranger" of the mine's wastes, pursuant to 
s 9607(a)(3). Although hands-on control of the mine was 
exercised at all relevant times by Eagle Shawmut Mine 
("Shawmut"), a partnership that leased the mine from Penn 
Mining Company, the District claims that the government 
stepped into the "operator" and "arranger" roles through a 
variety of measures it employed during and shortly after 
World War II, all aimed at assuring the production of zinc, a 
critical ingredient in armaments.

 The government's activities are set forth in great detail in 
the district court opinion, East Bay Mun. Util. Dist. v. 
United States Dep't of Commerce, 948 F. Supp. 78 (D.D.C. 
1996), and we will return to them later. For now it is enough 
to say that its interventions took two fundamental forms. 
First, it offered Shawmut incentives, in the form of a pur-
chase agreement at premium prices (prices in excess of 
otherwise applicable wartime price controls), accompanied by 
a loan to finance the mine's reopening. Second, it lowered 
the opportunity costs of operating the mine as a zinc supplier 
by restricting the alternative use of both natural and human 
resources needed for production. This second class of inter-


ventions included strict limits on the use of mines for produc-
tion of gold and regulations tending to lock workers into the 
mining industry generally and to funnel them specifically 
towards favored facilities such as Penn Mine.

 The United States defended on the grounds that 
CERCLA's provision for waiver of the federal government's 
sovereign immunity, s 9620(a)(1), precluded considering any 
of its regulatory activities--i.e., the price and labor controls, 
the restrictions on gold mining--in the calculus of whether it 
had been an operator. The government also argued that, 
even if its regulatory activities were considered, its involve-
ment in the mine did not place it in the role of an operator or 
arranger. On cross-motions for summary judgment based on 
jointly agreed facts, the district court rejected the govern-
ment's narrow construction of the waiver but nonetheless 
found it not to have become an operator or arranger. 948 
F. Supp. at 79. The District appeals the denial of the 
operator liability claim.

 We affirm. We hold that the waiver of immunity contained 
in s 9620(a)(1) is coextensive with the scope of the substan-
tive liability standards of CERCLA. Here, however, the 
government's actual involvement did not constitute "oper-
at[ion]" of Penn Mine under either the prevailing "actual 
control" or the alternative "authority to control" interpreta-
tion of that term.

 * * *

 CERCLA's waiver of immunity for the federal government, 
located in a section dealing with "Federal facilities," provides 
that:

 Each department, agency, and instrumentality of the 
 United States (including the executive, legislative, and 
 judicial branches of government) shall be subject to, and 
 comply with, this chapter in the same manner and to the 
 same extent, both procedurally and substantively, as any 
 nongovernmental entity, including liability under section 
 9607 of this title.


42 U.S.C. s 9620(a)(1). In turn, s 9607(a)(2) establishes lia-
bility for all remediation costs resulting from the release of a 
hazardous substance, for "any person who at the time of 
disposal of any hazardous substance owned or operated any 
facility at which such hazardous substances were disposed of." 
Thus, CERCLA clearly exposes the federal government to 
suit and potential liability for at least some cases in which it 
operated a facility that discharged hazardous waste. See 
Pennsylvania v. Union Gas Co., 491 U.S. 1, 10 (1989), 
overruled on other grounds by Seminole Tribe of Florida v. 
Florida, 517 U.S. 44 (1996).

 The District contends that s 9620's waiver of sovereign 
immunity extends to any instance in which the federal gov-
ernment may be deemed to have operated a facility, regard-
less of whether the government acted in a regulatory or in a 
proprietary capacity. The government reads the waiver as 
leaving it immune for acts performed in a regulatory capacity. 
This alleged residual immunity, of course, is relevant only for 
acts that are otherwise "operational," i.e., acts that would 
make a private actor an "operator" of a facility. On the 
government's theory, Congress has waived immunity under 
CERCLA only for those activities which could be performed 
by "any nongovernmental entity," but has retained immunity 
for such "uniquely and inherently sovereign" activities as 
imposing the price and labor regulations which are part of the 
basis of the District's operator claim here. It relies on the 
general principle that waivers of sovereign immunity are to 
be construed narrowly, including waivers likening the govern-
ment's liability to that of a private party. See, e.g., Library 
of Congress v. Shaw, 478 U.S. 310, 318 (1986) (saying, in 
analysis of clause making the government liable for costs "the 
same as a private person," that "we must construe waivers 
strictly in favor of the sovereign, and not enlarge the waiver 
beyond what the language requires") (internal citations and 
punctuation omitted); Laird v. Nelms, 406 U.S. 797 (1972) 
(construing FTCA waiver of immunity under which the gov-
ernment, "if a private person, would be liable," not to reach 
ultrahazardous strict liability claims, although private party 
would be liable under common law).


 Because the terms of the government's consent to be sued 
in any court "define that court's jurisdiction to entertain the 
suit," United States v. Sherwood, 312 U.S. 584, 586 (1941), the 
claim of immunity is jurisdictional. Here, however, the waiv-
er clause does not preclude our jurisdiction to entertain the 
suit, for as the government acknowledges, and as is plain, the 
clause waives the government's immunity at least insofar as 
the District's claim is grounded in such typically private 
activities as the financing of the mine and the purchasing of 
zinc.

 Our circuit has sometimes been ready to resolve a suit on 
the merits against a party asserting jurisdiction, where the 
merits issue was a no-brainer and the jurisdictional issue 
quite difficult. See, e.g., Cross-Sound Ferry Services, Inc. v. 
I.C.C., 934 F.2d 327, 333 (D.C. Cir. 1991); but see id. at 339 
(Thomas, J., concurring) (rejecting majority's choice to dis-
pose of claim on merits rather than to treat threshold juris-
dictional issue). The Supreme Court has recently rejected 
that practice. See Steel Company v. Citizens for a Better 
Environment, 118 S. Ct. 1003, 1012-16 (1998). We are 
uncertain whether Steel Company's holding requires us to 
resolve the government's waiver claim first, when, as here, 
even the merits evidence that would be excluded under the 
government's waiver theory comes nowhere near establishing 
liability, and when we are certain of our jurisdiction over the 
suit itself. Nonetheless, the more cautious approach is first 
to tackle the government's theory on the limits of the immuni-
ty waiver.

 It is true that there is a potential ambiguity in 
s 9620(a)(1)'s qualifying clause, "in the same manner and to 
the same extent ... as any nongovernmental entity." "[A]s 
any nongovernmental entity" can either be read broadly, to 
deprive the government of any immunity or defense not 
enjoyed by a nongovernmental entity that otherwise meets 
the criteria of s 9607; or, it can be read narrowly, as the 
government contends, so that it is liable for actions that 


trigger liability under s 9607--owning or operating a facility, 
or arranging for waste disposal--only when it performs those 
actions through the "proprietary" powers it shares with pri-
vate entities, such as by exercising contractual or property 
rights.

 Under the government's view, it would be liable when it 
exercised the sort of direct and detailed control that renders 
someone an operator through contract and property arrange-
ments but not when it exercised identical control powers 
through coercive, administrative measures. As we under-
stand this position, the government would be liable in the 
proprietary case even if (as would be typical, we suppose) its 
ability to exercise the controls through proprietary means 
ultimately flowed from its use of the sovereign tax power to 
fund the acquisition of the pertinent property rights or the 
fulfillment of its contract obligations.

 But the language of s 9620(a)(1) does not welcome the 
government's reading. By providing that the government is 
liable "in the same manner and to the same extent, both 
procedurally and substantively, as any nongovernmental enti-
ty" whenever it satisfies the criteria of s 9607, it does not on 
its face suggest a distinction between the exercise of private 
(what we are calling "proprietary") and regulatory powers.

 Further, CERCLA's strong tendency to focus on the sub-
stance of the government's (or any entity's) activities, rather 
than their form, cuts against the government's view. This 
comparative disregard for the formal relationships between 
the potentially responsible party and the facility is manifest in 
the very imposition of liability upon the category of "opera-
tors," whose role is defined functionally, not in terms of "the 
legal structure of ownership." See United States v. Kayser-
Roth Corp., Inc., 910 F.2d 24, 26 (1st Cir. 1990); see also 
Schiavone v. Pearce, 79 F.3d 248, 253-54 (2d Cir. 1996).1 
Similarly, CERCLA excludes from "owner or operator" liabil-
ity a secured creditor who holds "indicia of ownership" pri-

__________
 1 The Supreme Court is now considering the criteria for a parent 
corporation's liability as "operator" where primary operational con-


marily to protect its security interest but does not "partic-
ipat[e] in the management of a vessel or facility," 42 U.S.C. 
s 9601(20)(A); participation in management is in turn defined 
as "actually participating in the management or operational 
affairs of a vessel or facility." 42 U.S.C. s 9601(20)(E), (F)(i) 
(emphasis added), as amended by Asset Conservation, Lend-
er Liability, and Deposit Insurance Protection Act of 1996, 
Pub. L. No. 104-208, Tit. II, s 2502(b), 110 Stat. 3009-464; 
see also In re Bergsoe Metal Corp., 910 F.2d 668, 672 (9th 
Cir. 1990) (interpreting pre-amendment definition to same 
effect).

 A difficulty with anything other than a straightforward 
reading of the immunity waiver is the uncertainty entailed by 
the government's reading. As the Supreme Court has noted 
in the context of the Federal Tort Claims Act, 28 U.S.C. 
s 2680, it is "hard to think of any governmental activity on 
the 'operational level,' 2 ... which is 'uniquely governmental,' 
in the sense that its kind has not at one time or another been, 
or could not conceivably be, privately performed." Indian 
Towing Co. v. United States, 350 U.S. 61, 68 (1955). The 
converse is also true--it is hard to imagine any act that might 
lead to a finding of government "operator" liability that could 
not be recharacterized at a higher level of abstraction as a 
uniquely governmental activity. For example, in reading 
s 9620(a)(1) to provide only a limited waiver of the govern-
ment's immunity, the dissent in FMC Corp. v. United States 
Dep't of Commerce, 29 F.3d 833 (3d Cir. 1994), defined the 
government's activities at issue there as uniquely governmen-
tal, characterizing them in terms of the ultimate purpose for 
which they were performed--"winning a war." Id. at 847. 

__________
trol is exercised by a subsidiary. See United States v. Cordova 
Chemical Co. of Mich., 113 F.3d 572 (6th Cir. 1997), cert. granted 
sub nom. United States v. CPC Int'l, Inc., 118 S. Ct. 621 (1997).

 2 The term "operational" is used by the Court here in contradis-
tinction to activities excluded from liability by the "discretionary 
function" exception to the FTCA's waiver. See, e.g., United States 
v. Gaubert, 499 U.S. 315 (1991).


We do not wish to overstate this point; the special treatment 
of state governments' proprietary activities under the nega-
tive commerce clause, see, e.g., South-Central Timber v. 
Wunnicke, 467 U.S. 82 (1984), appears to have proven worka-
ble. But the FMC case at least suggests a nontrivial poten-
tial for confusion.

 Furthermore, s 9607(d)(1) of the Act confers a defense on 
"all persons" "for costs or damages as a result of actions 
taken or omitted in the course of rendering care, assistance, 
or advice in accordance with the National Contingency Plan," 
but does "not preclude liability for costs or damages as the 
result of negligence." As it appears that such activities are 
primarily or exclusively governmental, creation of the defense 
suggests a congressional assumption that immunization of 
specific purely governmental activities required a specific 
provision. See 42 U.S.C. s 9605(a)(4); see also 40 CFR 
ss 300.110, 300.115(b) (identifying membership of national 
and regional "response teams")

 Section s 9607(d)(2) affords modest additional light. It 
gives state and local governments a partial defense against 
claims arising from their emergency remediation efforts, lim-
iting their liability to cases of gross negligence or intentional 
misconduct. Both the majority and dissent in FMC reasoned 
that this provision bolstered their interpretations. But both 
assumed a proposition that was already embedded in Third 
Circuit law, that the federal government waiver does not 
embrace pollution caused by the federal government's hazard-
ous waste "clean-up" efforts. Compare 29 F.3d at 841 with 
id. at 848 n.2. We have never addressed that issue, so our 
circuit law contains no such premise, and resolving the issue 
would carry us far from this case. Thus the differing analy-
ses voiced in the Third Circuit do not seem relevant in our 
context. We think the special exception tends to cut against 
the government's theory. CERCLA abrogates state and 
local government immunity in terms virtually identical to the 
waiver of federal immunity, see 42 U.S.C. s 9601(20)(D), so 


the exclusion of liability for emergency remediation efforts 
seems to imply a background assumption that the waiver 
would otherwise extend to such a typical governmental activi-
ty.

 Finally, although the precise meaning of s 9620(a)(1)'s 
waiver language was not directly before the Court in Union 
Gas Co., 491 U.S. 1, it characterized s 9601(20)(D), the almost 
identically worded provision subjecting states to liability, as 
"unequivoca[l]" and "unqualified," 491 U.S. at 10, indicating 
that the statute's most authoritative reader may not be 
inclined to view the waiver as hedged by unwritten excep-
tions.

 In reaching this conclusion we do not at all rely on one 
argument urged by the District, namely, that the "remedial" 
nature of CERCLA warrants broad governmental liability. 
Compare FMC, 29 F.3d at 840-41. We have recently ex-
pressed our general doubts about the canon that "remedial 
statutes are to be construed liberally," since virtually any 
statute is remedial in some respect. See Ober United Travel 
Agency, Inc. v. United States Dep't of Labor, 135 F.3d 822, 
825 (D.C. Cir. 1998). To paraphrase Judge Bork, who was 
referring to the "scarcity" rationale for broadcast regulation:

 Since [remedial character] is a universal fact, it can 
 hardly explain [liberal construction] in one context and 
 not another. The attempt to use a universal fact as a 
 distinguishing principle necessarily leads to analytical 
 confusion. 

Telecommunications Research and Action Center v. FCC, 
801 F.2d 501, 508 (D.C. Cir. 1986). Moreover, the canon 
appears to assume a unidirectional statutory purpose, so that 
the "liberal" interpretation would be the one best effecting 
that sole purpose. But in fact statutes necessarily reflect a 
legislative balancing of competing purposes. See, e.g., Rodri-
guez v. United States, 480 U.S. 522, 525-26 (1987). Here, for 
example, it is unclear why shifting part of the clean-up cost 
from one pocket (the District) to another (the United States) 
is especially "liberal." Of course proliferation of accessible 
pockets might help clean up hazardous waste and spread risk; 


the federal government's pockets are deep and it is a risk-
spreader without peer. But in some situations the statute 
explicitly calls for reimbursement of the United States for 
clean-up costs it incurs, see 42 U.S.C. s 9607(a)(A), making 
clear the presence of additional purposes. Cf. Edward Hines 
Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 157 (7th 
Cir. 1988). 

 We thus at last reach the question of whether the govern-
ment's acts in relation to Penn Mine, including the regulatory 
and the potentially private acts pointed to by the District, 
made the government the mine's operator.

 

 * * *

 CERCLA defines "owner or operator" at s 9601(20)(A)(ii), 
as "in the case of an onshore facility or an offshore facility, 
any person owning or operating such facility." As the Sev-
enth Circuit has said of this virtually circular definition, "the 
statutory terms have their ordinary meanings rather than 
unusual or technical meanings." Hines Lumber Co., 861 F.2d 
at 156. Standard dictionary representations of ordinary lan-
guage tell us that to "operate" means to "direct the working 
of; to manage, conduct, work (a railway, business, etc.)," or 
"to manage and put or keep in operation whether with 
personal effort or not." The Oxford English Dictionary (2d 
ed. 1989); Webster's Third New International Dictionary 
(1967). These match our own understandings. The appear-
ance of "manage" in both definitions is unsurprising, and 
conjures up a person or party exercising hands-on control.

 The dominant explication of the language, adopted by the 
First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, 
and Eleventh Circuits, has looked to actual control, seeing an 
"operator" as someone actively involved in running the facili-
ty, typically on a day-to-day, managerial basis. See, e.g., 
United States v. Cordova Chemical Co. of Mich., 113 F.3d 
572, 579-81 (6th Cir. 1997); Redwing Carriers, Inc. v. Sara-
land Apts., 94 F.3d 1489, 1504-05 (11th Cir. 1996); Schia-
vone, 79 F.3d 248, 253-54 (2d Cir. 1996); United States v. 
Gurley, 43 F.3d 1188, 1193 (8th Cir. 1994); John S. Boyd Co., 
Inc. v. Boston Gas Co., 992 F.2d 401, 408 (1st Cir. 1993); 
Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 


1209, 1220-22 (3rd Cir. 1993); Joslyn Manuf. Co. v. T.L. 
James & Co., Inc., 893 F.2d 80, 83 (5th Cir. 1990); Hines 
Lumber Co., 861 F.2d at 157-59 (7th Cir. 1988); cf. In re 
Bergsoe Metal Corp., 910 F.2d 668, 672 (9th Cir. 1990) 
(addressing secured creditor provision). But the Fourth Cir-
cuit has opted for a broader interpretation of "operator," 
taking it to include not only those persons with actual control 
over a facility, but also "a party who possessed the authority 
to abate the damage caused by the disposal of hazardous 
substances but who declined to actually exercise that authori-
ty by undertaking efforts at a cleanup." Nurad, Inc. v. 
Langrall & Sons, 966 F.2d 837, 842 (4th Cir. 1992). As we 
shall explain, we find the District's claim inadequate even 
under the authority-to-control test, and thus need not make a 
final choice between the two interpretations.

 Looking first for the exercise of any managerial control, we 
find none. The detailed facts are set forth, as we have said, 
in the district court's opinion, and also in the Revised Joint 
Statement of the Parties ("R.S."). First, the price restric-
tions imposed by the government on the zinc market, while 
intended (in part) to protect its own efforts to acquire zinc for 
munitions production, did not amount to operation of any 
mining facility. This is not changed by the fact that the 
government allowed increments above the base controlled 
price for production in excess of the controlled levels. These 
steps represent a standard governmental device for reconcil-
ing an interest in keeping prices low (here, to make the war 
effort cheaper) with the conflicting interest in generating an 
adequate supply. They are, of course, variations on the ways 
a private buyer might offer special price advantages to gener-
ate a supply that would otherwise be unavailable, but they do 
not bring the government as buyer one whit closer to mana-
gerial control.

 Second, the government's regulations governing labor mo-
bility and hours, while they may have made continuation of 


operations easier for the mine operators by reducing the 
miners' potential rewards in alternative fields, and conceiv-
ably by extracting more work per dollar than would otherwise 
have been extractable, did not give the government the kind 
of direct managerial or supervisory authority over Penn's 
workforce that is a crucial component of operator liability 
under the actual control test. See United States v. Vertac 
Chemical Corp., 46 F.3d 803, 809 (8th Cir. 1995); Hines 
Lumber Co., 861 F.2d at 158; United States v. Dart Indus., 
Inc., 847 F.2d 144, 146 (4th Cir. 1988). Compare FMC, 29 
F.3d at 843 (majority asserting government "participat[ion] in 
the management and supervision of the labor force") with id. 
at 853 (dissent asserting that government merely helped 
employees overcome shortages of housing and community 
services and assisted the firm in reducing labor strife and 
absenteeism).

 Third, the government's financial backing of the mine, 
which appears to have been made as an advance against 
Shawmut's sales, was not sufficient to suggest control. Sec-
tion 9601(20)(A)'s exemption from owner liability for non-
managing security interest holders is again relevant here. 
Without "actually participating in the management or opera-
tional affairs of a vessel or facility," s 9601(20)(F)(i)(I), no 
mere financial backer--even one holding title to a facility as 
security for debt--is liable under CERCLA; see also In re 
Bergsoe Metal Corp., 910 F.2d at 671. Mere unsecured 
credit, unaccompanied by the "actual" managerial control 
needed for a secured creditor, clearly cannot give rise to 
operator liability.

 Fourth, entering into an output contract does not make the 
government an operator. The output contract between the 
U.S. and Penn Mine merely reflected the monopsonistic war-
time market and the willingness of the government to pay 
substantial premiums in order to meet its metals needs. 
Hines Lumber Co. is pertinent again. An operating compa-
ny, itself clearly responsible under CERCLA, sought to bring 
into the ring of CERCLA liability the firm that had supplied 


it with its key chemical input. The supplier had the contrac-
tual power to inspect the production process for quality 
control purposes, since the product was to be sold under that 
firm's trademark. But the supplier had no control of the 
work, no right to choose employees or to direct their activi-
ties. It thus had no operating control. 861 F.2d at 158.

 Whether taken severally or jointly, these factors do not 
support the District's claim of actual governmental control.

 We now return to the possibility of liability through mere 
authority to control. There are two aspects of the relation-
ship between the government and Shawmut from which one 
might spin such a theory. First, the War Production Board 
had contingent authority to seize any production facilities. In 
the early phases of World War II this was limited to facilities 
that refused to supply goods or refused to do so at reasonable 
prices; authority was later added to seize facilities that failed 
to produce because of labor stoppages. See R.S. WW 28-33. 
(Here we assume, in favor of the District, the correctness of 
its analysis of the controlling statutes.3) But whatever the 
scope or statutory validity of an "authority to control" test, 
we do not see how (subject to a qualification discussed below) 
it could encompass a contingent authority that was never 
triggered.

 Alternatively one could devise an "authority" claim from 
provisions in the purchase-and-loan contract between the 

__________
 3 In fact the District's reading seems correct. Section 9 of the 
Selective Training and Service Act of 1940, Ch. 720, 54 Stat. 892 
(1940), imposed on firms an obligation to comply with the Presi-
dent's orders "for such product or material as may be required," 
and authorized him to seize plants that refused to produce or 
refused to do so at reasonable prices. This authority was expanded 
in 1943 to include authority to seize facilities useful to the war effort 
in case of labor stoppage. War Labor Disputes Act, Ch. 144, 57 
Stat. 164, s 3 (1943).


United States (in the guise of the Metals Reserve Corpora-
tion) and Shawmut. But that contract granted the govern-
ment only the right "to inspect said Mine and said Mill and to 
examine and audit, or cause to have examined and audited, 
any of [Shawmut's] books and records." These inspection 
rights carried with them no managerial prerogatives or au-
thority. Further, the contract explicitly assigned to Shawmut 
full responsibility for the mine's "dewatering," "rehabilita-
tion," "conversion," and "operat[ion]," in conformity with 
"good mining and engineering practice." True, the contract 
also states that Shawmut's performance of these duties will 
be "in conformity with [its] proposals therefor heretofore 
submitted to and approved by the War Production Board." 
But a contractual right to ensure that a producer follows 
some agreed plan is hardly authority to control operations. 
Cf. Hines Lumber Co., 861 F.2d at 158 (declining to infer 
"control" from non-producer's right to inspect and from pro-
ducer's obligation to keep plant in compliance with environ-
mental rules).

 Under either the "authority" or the conventional "actual 
control" theory, one might assign CERCLA responsibility on 
the basis of duress. Suppose one party, without itself exer-
cising day-to-day control, wielded such power over a hands-on 
operator that the operator was merely its pawn. The Mafia, 
for example, might exercise such power over a legally inde-
pendent firm, so that the Mafia might properly be held liable 
for the firm's acts just as any party is held liable for the acts 
of its agents. For our purposes, one might try to ground 
such a duress theory in two factors--the War Production 
Board's contingent power to seize the mine if it refused to 
supply goods (or refused to do so at reasonable prices), or 
from the government's order closing gold mines. But an 
argument from duress does not work on the record here.

 First, consider the gold mining restriction. If a mine could 
be used for gold or zinc, and the government forbade gold 
mining, there might be some situations where the ban left the 


owner no choice but to produce zinc or suffer serious out-of-
pocket losses. But it appears that the Penn Mine had no 
potential function as a gold mine, so that the gold-mining ban 
did not put Shawmut in any such bind. In fact Shawmut 
operated a gold mine elsewhere. Let us suppose, for a 
moment, that the gold-mining ban had induced Shawmut to 
close this mine. The availability of equipment and miners 
released from the gold mine might well have made it easier to 
mine zinc at Penn Mine, and conceivably evidence about 
market conditions for mining equipment might prove that its 
displacement from gold mining placed Shawmut in the kind of 
bind we considered for the hypothetical mine that could 
produce either gold or zinc. But the District offered no such 
evidence. This is no surprise: in fact Shawmut continued to 
produce gold at its gold mine through the war. R.S. p 71. 
No duress claim can be grounded in the evidently ineffectual 
gold-mining ban.

 Similarly, one can imagine a party so threatened by the 
War Production Board's seizure power as to have been driven 
to produce against its will. But no such threat seems ever to 
have loomed here. The district court summarized the record 
as showing that Shawmut's production efforts were the result 
of consensual agreement with the government, 948 F. Supp. 
at 90, and the District does not dispute the finding. Indeed, 
it appears from the record that Shawmut sought out govern-
ment financing on its own initiative in order to reopen Penn 
Mine. This view of the operations as consensual is of course 
further confirmed by the government's offers of increased 
prices; the carrot prevailed, not the stick. The differences 
between the government's actions here, and those of any 
buyer who is very determined to elicit a supplier's production, 
are not enough to make it an operator under CERCLA.

 

 * * *

 The judgment of the district court is

 Affirmed.